NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| REYNALDO RAMIREZ, | Hon. Garrett E. Brown, Jr. |
| Plaintiff, | Civil Action No. 06-1042 |
| v. | **MEMORANDUM OPINION** |
| UNITED PARCEL SERVICE, | |
| Defendant. | |

**BROWN, Chief Judge:**

Before the Court is Defendant's motion (Doc. No. 111) for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50, on Plaintiff's non-promotion claim, which is the sole remaining claim in this case. Previous decisions of this Court have dismissed Plaintiff's other claims, and a jury trial has resolved Defendant's counterclaims. For the following reasons, the Court will grant Defendant's motion.

*Background*

This case arose from Plaintiff's claims of race-based employment discrimination against his former employer, Defendant United Parcel Service (UPS), as well as UPS's counterclaims for conversion and unjust enrichment. As this Court recounted in the October 14, 2010 Case Status Order (Doc. No. 110), the Honorable Joseph A. Greenaway, Jr., then-United States District Judge and now United States Circuit Judge, granted UPS's motion for summary judgment in part on December 31, 2008 (Doc. Nos. 39–40), dismissing all claims of Plaintiff's Complaint except for

1

Counts I, II, and VI; these Counts represented Plaintiff's claims under the New Jersey Law Against Discrimination (NJLAD) for hostile work environment (I and II) and UPS's failure to promote him in 2004 (VI).  This matter was reassigned to the undersigned by Order of March 8, 2010.  By Opinion and Order of May 17, 2010, the Court granted UPS's *in limine* motions in part and precluded Plaintiff from presenting evidence relating to, *inter alia*, (1) previously dismissed claims for disability-based harassment, discriminatory pay raises, and the 2001 denial of a promotion, and (2) harassment creating a hostile work environment that occurred prior to 2004.  (*See* Doc. Nos. 67–68.)  The Court held a jury trial to resolve Plaintiff's two remaining claims (hostile work environment, non-promotion) and UPS's counterclaims from September 17–24, and at the close of evidence on September 24, the Court heard argument on UPS's motion for a directed verdict on Plaintiff's non-promotion and hostile work environment claims.  The Court granted UPS's motion for a directed verdict on Plaintiff's hostile work environment, and reserved judgment with regard to Plaintiff's non-promotion claim, ultimately submitting the non-promotion claim and UPS's counterclaims to the jury.  The jury returned a partial verdict on September 28, awarding $13,431.73 in damages on UPS's counterclaims, but the jury could not reach a unanimous verdict with regard to Plaintiff's non-promotion claim.  (*See* Doc. No. 103.)  Subsequent to the jury verdict, Plaintiff moved to reduce the jury's assessment of UPS's damages, and UPS renewed its motion for a directed verdict on Plaintiff's non-promotion claim.  The Court denied Plaintiff's motion without prejudice and reserved judgment on UPS's renewed Rule 50 motion.  The Court's October 14 Status Order permitted UPS to renew its Rule 50

motion and tentatively scheduled the date for a retrial of the non-promotion claim.[1]

UPS now renews its motion for a directed verdict pursuant to Rule 50, arguing that the evidence Plaintiff submitted at trial did not present a triable issue of race-based discrimination under the NJLAD, and even if it did, that the evidence presented at trial could not support the finding, by clear and convincing evidence, *see* N.J. Stat. Ann. 2A:15-5.12(a), of "especially egregious" conduct necessary for an award of punitive damages under the NJLAD, *see, e.g.*, *Rendine v. Pantzer*, 141 N.J. 292, 314 (1995). Plaintiff responds that Judge Greenaway's contrary conclusion in the December 31, 2008 opinion, which denied summary judgment on the 2004 non-promotion claim, precludes deciding the issue as a matter of law, and that the trial evidence established numerous questions of fact that must be determined by a jury. Plaintiff further responds that the evidence demonstrates that he was "intentionally denied" a "fair administration" of UPS's promotion procedures, and, thus, that a jury reasonable jury could find that punitive damages were warranted under the circumstances. (Pl.'s Br. at 8.[2]) This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), because the parties are of diverse citizenship, and the amount in controversy at the time of filing exceeded $75,000. (*See, e.g.*, Final Pretrial Order ¶ 1.)

### *Analysis*

A motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b)

---

[1] The trial date set in the October 14 Status Order has been adjourned pursuant to the parties' request.

[2] Because Plaintiff's brief does not have page numbers, the Court refers to pages of the brief by their natural numerical sequence.

"should be granted only if, viewing the evidence in the light most favorable to the non movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir.1993); *see also Mandile v. Clark Material Handling Co.*, 131 F. App'x 836, 838 (3d Cir.2005). "In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Lightning Lube*, 4 F.3d at 1166 (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 190 (3d Cir.1992)). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube*, 4 F.3d at 1166 (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir.1978)); *see also Raiczyk v. Ocean County Veterinary Hosp.*, 377 F.3d 266, 268 (3d Cir.2004) ("A judge may overturn a jury verdict only when, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.") (quotations omitted).

     Here, UPS argues (1) that Plaintiff failed to present sufficient evidence at trial to make out a *prima facie* case of racial discrimination under the *McDonnell Douglas* framework applicable to NJLAD claims; (2) that UPS presented evidence of a legitimate, non-discriminatory reason for the non-promotion; and (3) that Plaintiff failed to present evidence of pretext. Cumulatively, UPS argues that Plaintiff did not satisfy the burden of persuasion for his non-promotion claim. After carefully reviewing the relevant evidence submitted at trial, and drawing all reasonable inferences in favor of Plaintiff, the Court agrees that a reasonable jury could not

4

have found in favor of Plaintiff on the non-promotion claim.

    *1. The* McDonnell Douglas *Standard for NJLAD Claims*

The appropriate "starting point" for employment discrimination claims arising under the NJLAD is the burden-shifting framework for discrimination under Title VII articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). *E.g.*, *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 595 (1988); *see also Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) ("Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim."). *McDonnell Douglas* analysis consists of three steps: first, a plaintiff must present sufficient evidence to present a *prima facie* case of discrimination; second, if the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for the adverse employment decision; third, if the defendant presents such justification, the burden of production shifts back to the plaintiff, who must prove by a preponderance of the evidence that the defendant's nondiscriminatory reasons were merely pretext for discrimination. *E.g.*, *Clowes*, 109 N.J. at 596; *Dooley v. Roche Labs., Inc.*, Civ. No. 04-2276, 2007 WL 556885, at *5 (D.N.J. Feb. 15, 2007).

    In order to establish a *prima facie* case of discrimination under *McDonnell Douglas*,

> [t]he plaintiff must demonstrate by a preponderance of the evidence that he or she (1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications.

*Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 492 (1982) (citing *McDonnell Douglas*, 411 U.S. at

5

802); *see also Clowes*, 109 N.J. at 596.  Where, as here, the position does not remain open, a court may modify the last prong of the *prima facie* case to consider whether "someone similarly situated but not in the protected group received better treatment" than the plaintiff.  *Jackson v. Del. River & Bay Auth.*, Civ. No. 99-3185, 2001 WL 1689880, at *16 (D.N.J. Nov. 26, 2001); *see also E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990) (noting that the plaintiff "must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a[n] [unlawful] discriminatory criterion," and instructing courts to "be sensitive to the myriad of ways such an inference can be created").  Defendant's burden in rebutting a *prima facie* case of discrimination is "rather light."  *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300 (3d Cir. 2004); *see also Salkovitz v. Pioneer Elecs. (USA), Inc.*, Civ. No. 04-344, 2005 WL 1638141, at *4 (D.N.J. July 12, 2005).  Indeed, the New Jersey Supreme Court has described the employer's burden in this regard as "so light as to be 'little more than a mechanical formality; a defendant, unless silent, will almost always prevail.'"  *Mogull v. CB Commercial Real Estate Group, Inc.*, 162 N.J. 449, 469 (2000) (citation omitted).  Once the defendant has rebutted the *prima facie* case, "the plaintiff must convince the factfinder 'both that the reason was false, and that discrimination was the real reason.'"  *See, e.g.*, *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993)); *McKenna v. Pacific Rail Serv.*, 32 F.3d 820, 826 (3d Cir. 1994).  "The ultimate burden of persuasion that the employer intentionally discriminated against the employee remains with the employee at all times."  *Clowes*, 109 N.J. at 596.

6

*2. The Evidence Presented at Trial*[3]

The following facts were stipulated to in the Final Pretrial Order. Plaintiff's non-promotion claim concerns his attempt in 2004 to replace Robert Schroeder, UPS's hazardous materials compliance supervisor who was retiring. Selection for the position would involve a promotion to the title and pay grade of full-time supervisor. UPS managers Robert Agazzi and Glenn Henry, who are Caucasian, recommended that Plaintiff be promoted to this position. UPS Human Resources Manager Rudy Louhisdon, who is African-American, met with Plaintiff about the promotion attempt and informed Plaintiff that Plaintiff's starting monthly salary for the compliance supervisor position would be between $4,600 and $4,700. At the time, Plaintiff had been earning a monthly salary of $4,200. UPS subsequently assigned Joseph Caruso, a white full-time supervisor, to the position formerly held by Schroeder. Subsequent to Plaintiff's complaints about his salary, Louhisdon gave Plaintiff a $200 per month raise. (*See, e.g.*, Final Pretrial Order ¶¶ 9–14.)

Evidence adduced at trial revealed that four white UPS managers (Agazzi, Henry, Schroeder, and Lazlo Pribelszky) and one African-American UPS manager (Louhisdon) recommended plaintiff for promotion and/or facilitated his progress through UPS's preliminary "opt-in" process, which was a prerequisite for promotion. (Trial Tr. 9/17/10 at 118:23–119:1 (Pribelszky); Trial Tr. 9/20/10 at 62:14–63:12, 87:7–88:6, 90:5–16 (Agazzi); *id.* at 156:13–21 (Schroeder); Trial Tr. 9/22/10 at 74:16–18 (Louhisdon)). Louhisdon testified that Plaintiff was

---

[3]The Court notes that Plaintiff's brief opposing UPS's motion does not contain a single citation to the trial record. Nevertheless, the Court has expended great efforts to examine the trial record and transcripts in order to assess the merits of Plaintiff's arguments.

the only person UPS considered for the Schroeder vacancy. (Trial Tr. 9/22/10 at 139:17–19, 140:3–6 (Louhisdon); *see also* Trial Tr. 9/20/10 at 63 (Agazzi) (describing Plaintiff as "absolutely . . . the most qualified" candidate for Schroeder's position in the candidate pool, and stating "[t]hat's why [he] pushed to have [Plaintiff] promoted").) He further testified that Agazzi had requested the best starting salary possible for Plaintiff and that, based his review of UPS's pay scale guidelines, he determined that Plaintiff should be promoted as a grade 13 supervisor, which permitted a maximum starting salary of $4,650 per month. (*Id.* at 64:16–19, 85:21–24, 87:5–16, 154:22–156:7 (Louhisdon)). Although he decided to offer Plaintiff the maximum grade and salary he determined that the guidelines would permit, Louhisdon testified that he had the discretion under the guidelines to promote Plaintiff at the lower grade 12 pay scale level. (*Id.* at 64:19–20, 85:21–24, 87:11–16 (Louhisdon).)

  Trial testimony corroborated that Louhisdon, Agazzi, and Henry met with Plaintiff about the promotion in January 2004 ("January meeting"), and Louhisdon advised Plaintiff that the promotion came with a starting monthly salary of $4,650. The purpose of the meeting, according to Louhisdon and Agazzi, was to offer the promotion to Plaintiff (*see, e.g.*, *id.* at 65:20 (Louhisdon) ("We all knew [Plaintiff] was there to get the job"); Trial Tr. 9/20/10 at 97:24–25 (Agazzi) (describing the starting salary dispute as occurring during "the 11th hour, the 59th minute of [Plaintiff's] promotion")), and Plaintiff believed that to be the purpose of the meeting (Trial Tr. 9/24/10 at 88:19–23 (Ramirez)). According to Plaintiff's testimony, Plaintiff responded to the proposed salary by saying "They told me it was going to be at least 5,000," Louhisdon replied that such a salary was a "rate of supervisor that's a higher level," and Plaintiff

8

responded "I've been with the company 17 years.  How much more experience do I need to get a higher level of—a higher ranger of pay?" (Trial Tr. 9/23/10 at 161:17–21, 162:15–17 (Ramirez).)  Both Louhisdon and Agazzi testified that Plaintiff's reaction to the proposed salary convinced them that Plaintiff did not want the position at the salary that Louhisdon had determined was appropriate.  (Trial Tr. 9/22/10 at 63:20-23 (Louhisdon); Trial Tr. 9/20/10 at 71:8–11, 95:17–96:1, 97:20-98:2 (Agazzi)).  At that point, Louhisdon asserted that UPS began "to look into other plans" for the Schroeder position.  (*Id.* at 87:16, 139:20–140:6 (Louhisdon).)  By contrast, Plaintiff testified that he left the meeting with the understanding that Louhisdon would look into the salary issue further and report back to him.  (Trial Tr. 9/23/10 at 165–66 (Ramirez).)  According to Plaintiff, after multiple attempts to follow up with Louhisdon and Agazzi were unsuccessful, and after speaking with the regional manager about the issue, he met with Louhisdon approximately four months after the January meeting, and Louhisdon informed him that UPS had decided not to promote him.  (*See id.* at 167–77.)  At this second meeting, Louhisdon informed Plaintiff that UPS decided to lateral Caruso into the Schroeder position.  (*Id.* at 177:9–10.)

With regard to the salary figure offered at the January meeting, Plaintiff testified that he was taken aback, because Agazzi, Henry, and Schroeder had previously told him that the position would have a starting salary of $5,000.  (*See* Trial Tr. 9/23/10 at 153–56.)  Plaintiff also testified on redirect that he "knew" the figure offered was "wrong" (Trial Tr. 9/24/10 at 105:19), because he should have been promoted at a higher pay rate under a UPS guideline that required TSG (technical support group) employees be promoted to a minimum of grade 14 (*id.* at 122–24).

9

However, Plaintiff did not produce evidence of this policy, and he previously testified unambiguously that he had not read the UPS salary guidelines applicable to his promotion prior to the instant litigation. (Trial Tr. 9/23/10 at 164:19–165:5 (Ramirez) (explaining that he thought the salary offer was unfair, because "18 years in a company, you get to learn what the guidelines are with regard to starting salaries. You understand how they rate a person to be given a certain range of pay. I've known these guidelines for years. We were never allowed at my level to see the actual structures that you've seen here. So—however, I did not know the structure, but I knew that the guidelines had been violated for years with me. So, the 4,650 that he was offering me was extremely low for a person with my skill level, and the years in service, and my evaluations for the time that I had in that company"); Trial Tr. 9/24/10 at 49–50 (Ramirez) (repeatedly stating that he had never read UPS's 2004 salary administration guidelines prior to the beginning of the lawsuit in 2004).) When presented with the 2004 guidelines on cross-examination, Plaintiff conceded that the guidelines prevented Mr. Louhisdon from offering him more than $4,650 as a grade 13 new supervisor, and did not specifically contest Louhisdon's decision to rate him as a grade 13. (Trial Tr. 9/24/10 at 105–08 (Ramirez).)

     The Court also heard undisputed evidence that (1) Caruso received a starting monthly salary of approximately $4,300 when he became a full-time supervisor in 2001 (Trial Tr. 9/17/10 at 88:15–23 (Caruso)); (2) that Louhisdon had nothing to do with Caruso's promotion in 2001, because it occurred before he came to the local UPS district (Trial Tr. 9/22/10 at 152–53 (Louhisdon)); and (3) that Louhisdon had promoted one other UPS employee to a supervisor position between 2002 and 2006—an African-American female, whom the Court will refer to as

10

"JB" (*Id.* at 159–60).  Louhisdon also corroborated that, following the failed promotion attempt, Plaintiff complained of discriminatory pay raises, and that he authorized a $200 pay raise for Plaintiff to address this complaint.  (*Id.* at 164–65.)

      3. *Application of* McDonnell Douglas

The Court agrees with UPS that Plaintiff has not set forth a *prima facie* case of unlawful discrimination under the NJLAD, because Plaintiff has not presented evidence creating an inference that UPS denied him the promotion on the basis of race.  *See Metal Serv. Co.*, 892 F.2d at 348.  Although it is not disputed that Plaintiff was a member of a protected class under NJLAD (being both Hispanic and African-American in race), and that he was qualified for the Schroeder position when he applied for it, the undisputed trial evidence discussed above demonstrated (1) that Plaintiff was the only person considered by UPS for the Schroeder position, (2) that the promotion attempt fell apart after Plaintiff requested a higher monthly salary, and (3) that only then did UPS consider a different candidate for the position.  Although Plaintiff argues that the Caucasian employee assigned to Schroeder's position (Caruso) was less qualified than him, UPS never contested that Plaintiff was the most qualified candidate, and the undisputed trial testimony of UPS's decisionmakers (*i.e.*, Louhisdon, Agazzi) reflects that they assisted Plaintiff through the promotional process, met with Plaintiff with the intent to offer him the promotion,[4] proposed a starting salary of $4,650/grade 13 to Plaintiff for the promotion, and only considered an alternative candidate when Plaintiff requested a higher starting salary.

---

    [4]Louhisdon's testimony suggests that, because Plaintiff objected to the proposed starting salary, he did not yet have the opportunity to formally offer him the job.

Furthermore, the candidate UPS selected for the position was already a supervisor, so the personnel decision did not require UPS to go through the promotion process. Under such circumstances, a reasonable jury could not conclude that "someone similarly situated but not in the protected group received better treatment" than Plaintiff. *See Jackson v. Del. River & Bay Auth.*, Civ. No. 99-3185, 2001 WL 1689880, at *16 (D.N.J. Nov. 26, 2001). Indeed, three years earlier when Caruso had been similarly situated to Plaintiff—*i.e.*, when he was a candidate for promotion to the title of full-time supervisor—UPS offered Caruso considerably less money ($4,300 per month) to become a full-time supervisor than it offered Plaintiff ($4,650 per month).

Even if Plaintiff had set forth sufficient evidence to present a *prima facie* case of racial discrimination, UPS has more than articulated a legitimate, non-discriminatory reason for not promoting Plaintiff in 2004, and Plaintiff has presented no evidence that this reason was pretext for unlawful discrimination. As noted above, UPS's decisionsmakers testified that they sought to give Plaintiff the maximum salary for the promotion; that they offered Plaintiff the maximum grade and salary available, despite having the discretion to offer either a lower grade or a lower grade-13 salary; and that they believed Plaintiff had definitively rejected the proposed starting salary for the promotion. Plaintiff presented no evidence that would suggest that the salary offer at the January meeting was made in bad faith, as pretext for unlawful racial discrimination.

In response to UPS's pretext argument, Plaintiff relies entirely on Judge Greenaway's December 31, 2008 decision, which found that Plaintiff had presented sufficient evidence of pretext to create an issue of fact. (Pl.'s Br. at 6.) Yet, Plaintiff abandoned the evidence material to Judge Greenaway's pretext determination at trial when it became evident that it did not apply

12

to Plaintiff's promotion.[5]  Judge Greenaway's December 31 opinion states in pertinent part:

---

[5]Similar inconsistencies in the trial evidence and the evidence offered in opposition to summary judgment led this Court to dismiss Plaintiff's hostile work environment claim for lack of evidence on UPS's initial Rule 50 motion at the close of evidence.  Ruling from the bench, the Court stated:

> To set forth a hostile work environment claim based on race, plaintiff must prove [by a] preponderance of the evidence that the conduct occurred in the workplace because of his race.  That the alleged conduct was severe or pervasive enough to make a reasonable Hispanic or black man believe that the conditions of his employment were altered, and his work environment was hostile or abusive. . . .
>
> Now, we've heard various theories come about.  [During] opening statement[s], we heard references to use of "N" word, and "S" word, which we've not heard. We've heard in the papers a reference to "boy" or "bitch," which we have not heard.
>
> We've got here what seems to be a disparate treatment assertion, but with no comparison, *i.e.*, that various things were done which the plaintiff disagrees with and that this could only have been done by some covert program to discriminate against him by unnamed persons, black, white, or Hispanic in the organization.
>
> This is not the failure to promote claim.  The fact that he apparently had excess monies in his paycheck and that his supervisor called him a thief to infer that that must be because he is Hispanic or because he is black, *et cetera*, there is no evidence of that.
>
> It seems to me it rises purely to the level of speculation.
>
> Whether or not the plaintiff believes this, I can't find that any reasonable person would believe that these things were done because of race or ethnicity.
>
> I was inclined, based upon the opening statement and thereafter, to let this proceed. But now that I look at it, I'm reminded—and I don't remember whether it was Dorothy Parker or Gertrude Stein who said, "There is no there there."

13

In order to demonstrate that Defendant's stated reason is pretext, Plaintiff states that he was told by Aggazi that the position warranted a $5000.00 [a month] salary. (Plaintiff's R. 56.1 Statement at ¶ 32.) Aggazi testified in his deposition that Plaintiff would have been a full-time supervisor in the package operations area, if he had received the promotion at issue. (Plaintiff's Sur-Reply, Exhibit F.) Defendant's own 2004 Salary Administration Guidelines stipulate that in 2004, the starting salaries for Operations Supervisors, including those in package operations ranged between $4,975 and $5,375.

This information casts serious doubt on Defendant's stated legitimate non-discriminatory reason for denying Plaintiff a promotion. *See Murray v. Newark Housing Authority*, 311 N.J. Super. 163, 173, 709 A.2d 340 (Law Div.1998) (citations omitted). "The applicable evidential standards, presumptions, and burdens of production and proof that apply thereafter have been set forth by the Supreme Court's decisions in *Burdine*, as modified by *St. Mary's Honor Center v. Hicks*. As those cases establish, in order to rebut the presumption of discrimination raised by plaintiff's prima facie case, the employer must come forward with evidence of a legitimate, nondiscriminatory reason for the layoff. If the employer provides such evidence, the presumption of discrimination disappears. The burden of production then shifts back to the employee to show that the stated reason is a mere pretext. He may do so either by persuading the court directly "that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."

In this case, Plaintiff has offered evidence which suggests that Defendant's proffered explanation for failing to promote Plaintiff is unworthy of credence. This Court finds that there are genuine issues as

---

As I look at it, there is no there there.

The question is whether any reasonable jury, under the law, could find for the plaintiff based on this evidence on the hostile work environment claim. I look at it, and I can't find it.

And the various items which Judge Greenaway anticipated in the motion have not been produced. . . .

(Trial Tr. 9/24/10 at 143–44 (granting UPS's Rule 50 motion in part).)

14

> to material facts regarding whether Defendant failed to promote plaintiff
> based upon discriminatory reasons.  Consequently, Defendant's motion
> for summary judgment as to Count VI of Plaintiff's Complaint is denied.

*Ramirez v. United Parcel Service, Inc.*, Civ. No. 06-1042, 2008 WL 5451022, at *6 (D.N.J. Dec. 31, 2008).  The portion of the 2004 salary guidelines noted by Judge Greenaway had been presented by Plaintiff in a sur-reply (Pl.'s SJ Sur-Reply, Ex. F), and, as Judge Greenaway noted, it ostensibly applied to operations supervisors, including those in "package operations."  During trial, however, when Plaintiff's counsel inquired regarding a similar range of starting salaries under the 2004 guidelines, the Court heard Louhisdon's undisputed testimony that the Schroeder job Plaintiff was applying for was not classified as a "package operations" position.  (Trial Tr. 9/22/10 at 120–21 (Louhisdon).)

     Specifically, during direct examination of Louhisdon, Plaintiff's counsel presented Louhisdon with a portion of the 2004 guidelines (Plaintiff's Exhibit 38) that indicated that the starting monthly salary for "feeder, or on-road package operations and automotive and plant engineering supervisors who directly supervise mechanics" would be between $4,975 and $5,125.  (See Trial Tr. 9/22/10 at 122–24.)  Defense counsel objected that the document showed salary ranges for a different type of UPS employee than the position Plaintiff was applying for.  (*Id.* at 122:14–15.)  Plaintiff's counsel did not present evidence suggesting that Plaintiff should have qualified for a starting salary in that pay range, and did not further pursue the issue on redirect.  On cross-examination, however, Louhisdon testified that a different pay range applied to Plaintiff, because as of January 2004, Plaintiff was a grade 35 packaging engineering full-time specialist.  Louhisdon was presented with the portion of the 2004 guidelines applicable to

15

full-time specialists (Defense Exhibit 59), and Louhisdon testified that the applicable salary range for grade 35 full-time specialists was $2,725–$6,100. (*Id.* at 142–46 (Louhisdon).) As noted above, Louhisdon also testified that he determined, based on the 2004 guidelines, that the maximum grade and pay for Plaintiff's promotion was grade 13, $4,650 per month. (*Id.* at 64:16–19, 85:21–24, 87:5–16, 154:22–155:5 (Louhisdon)). Thus, Plaintiff's pretext argument is unavailing, and Plaintiff does not point to any evidence introduced at trial that supports his pretext position.

      Plaintiff's vague testimony regarding a policy that required him to be promoted to a grade 14 does not disturb this conclusion, because Plaintiff unambiguously testified that he had not read the 2004 guidelines prior to the instant litigation, and Plaintiff's counsel abandoned this line of inquiry when defense counsel objected that there was no foundation for the contention that the purported policy applied to Plaintiff's promotion in 2004. The trial transcript of this line of questioning (on redirect) reflects, in pertinent part:

> Q: Did you have knowledge of what the UPS policy was regarding TSGs and promotions?
>
> A: Yes, because I was a TSG.
>
> Q: . . .[W]hat was the policy?
>
> A: It stated that a TSG, because of their skill level, if they were to be considered for promotion, had to be greater than Grade 14.
>
> Q: Okay. Did you have this knowledge when you went in to speak to Louhisdon in January of '04?
>
> [Defense Counsel]: Objection; it's irrelevant to the prior years. The guidelines of each year, Judge, are the guidelines for that year. Whatever he knew—

16

> THE COURT: But this was in '04, was it not?
>
> [Defense Counsel]: He's just said '02—'01, '02 and '03. Those are irrelevant.
>
> THE COURT: Well, let's focus on '04.
>
> [Plaintiff's Counsel]: I'll ask another question.

(Trial Tr. 9/24/10 at 124:3–19.) Plaintiff's counsel did not revisit the issue, and Plaintiff neither presented the purported policy, nor presented evidence that it was applicable to him at the time of the attempted promotion. Rather, the Court heard Louhisdon's undisputed testimony that, prior to Plaintiff's promotion attempt, Plaintiff was making $3,924 per month as a grade 35 full-time specialist. (Trial Tr. 9/22/10 at 146:14–15 (Louhisdon).) Thus, the $4,650 monthly salary offered Plaintiff represented an annual raise of $8,700. (*Id.* at 161.) While, as noted above, UPS presented Louhisdon's testimony that the highest grade and monthly salary he could offer Plaintiff under the 2004 guidelines was grade 13/$4,650, and that he had the discretion to offer Plaintiff less money, Plaintiff's counsel presented no evidence that the money UPS offered Plaintiff for the Schroeder position undercut applicable guidelines for the promotion.

However, assuming *arguendo* that Plaintiff had presented evidence that a higher salary range or grade *should* have applied to his promotion, the facts surrounding the promotion attempt do not suggest that such a mistake was pretext for racial discrimination. It is undisputed that the UPS management involved in the promotion process assisted Plaintiff through UPS's pre-promotion process and supported his promotion. It is undisputed that UPS management did not consider other candidates for the Schroeder position, and that all sides expected Plaintiff to be

17

promoted at the January meeting.  It is undisputed that Agazzi spoke to Louhisdon about offering Plaintiff the highest salary he could receive in the promotion, that Louhisdon had the discretion to offer Plaintiff a lower grade and/or starting salary, and that Louhisdon made a salary offer to Plaintiff for $4,650, which was the maximum starting salary available at grade 13.  It is undisputed that the meeting ended after Plaintiff expressed concern about the starting salary, and that UPS ultimately selected a Caucasian supervisor—Caruso—to lateral into Schroeder's position. Moreover, when Caruso had been promoted to the title of supervisor three years before Plaintiff's promotion attempt, he was offered a significantly lower starting salary than Plaintiff was offered.  It is also undisputed that, when Plaintiff complained subsequent to the failed promotion attempt about the raises he had been receiving, Louhisdon authorized a $200-per-month raise for Plaintiff.

      The Court heard argument on UPS's Rule 50 motion at the close of evidence, and Plaintiff's counsel conceded that UPS wanted to promote Plaintiff.  (*See* Trial Tr. 9/24/10 at 152–53.)  Yet, Plaintiff's counsel responded that UPS "wanted to keep [Plaintiff] down," and that UPS "wanted him cheap." (*Id.* at 153:3–4.)  The undisputed evidence produced at trial does not support this claim.  Louhisdon, who as manager of human resources was the primary decisionmaker, facilitated Plaintiff's progress through UPS's pre-promotion process and offered Plaintiff the maximum available salary for the promotion at grade 13, when he could have offered a lower grade and/or starting salary.  Louhisdon further gave Plaintiff a $200-per-month raise after the failed promotion attempt.  Plaintiff presented no evidence that Louhisdon, an African-American, discriminated against him on the basis of race, while UPS presented evidence

18

that the only person Louhisdon had promoted to the title of full-time supervisor while he was the manager of human resources was JB, an African-American woman. When presented with these undisputed facts, Plaintiff's counsel argued (and still argues) that Louhisdon was improperly influenced by UPS's Caucasian managers (*i.e.*, Agazzi) (*see id.* at 159–60; *see also* Pl.'s Br. at 6–7), but this argument makes no sense, because according to Plaintiff, Agazzi, Henry, and Schroeder (all Caucasian UPS managers) suggested a *higher* starting salary for Plaintiff than Louhisdon determined that he could offer under the guidelines. Plaintiff also now argues that Louhisdon's lack of familiarity with Plaintiff's work history led to a low grade assessment and salary offer (Pl.'s Br. at 7), but accepting this argument as true, it would only permit the inference of negligence, not an inference of racial discrimination.

   Having carefully reviewed the evidence submitted by the parties, the Court agrees with UPS that Plaintiff has not met either the burden of production or the burden of persuasion with respect to the non-promotion claim. Based on the undisputed evidence submitted at trial, a reasonable jury could not have found in favor of Plaintiff on the non-promotion claim.

   Plaintiff has had four years to litigate this claim, culminating in a week-long trial. Nevertheless, he has failed to present competent evidence in support of his claim, and he has adopted numerous inconsistent positions throughout the course of this litigation. Under these circumstances, it would be improper to conduct a second trial on the non-promotion claim. Accordingly, the Court will grant UPS's Rule 50 motion and dismiss Plaintiff's non-promotion

claim.[6]  Because this decision resolves the last remaining claim, the Court will enter judgment on the jury's partial verdict in favor of UPS, and, having granted UPS's Rule 50 motions on both of Plaintiff's claims, the Court will enter judgment in favor of UPS and against Plaintiff on Plaintiff's hostile work environment and non-promotion claims.

## *Conclusion*

For the aforementioned reasons, the Court will grant Defendant's motion (Doc. No. 111) for judgment as a matter of law on Plaintiff's non-promotion claim.  Nothing remains of this case, and the Court will order the matter closed.  An appropriate form of order accompanies this Memorandum Opinion.

Dated: January 31, 2011

                                                       /s/ Garrett E. Brown, Jr.
                                         GARRETT E. BROWN, JR., U.S.D.J.

---

[6]Because the Court finds that Plaintiff failed to present sufficient evidence for his NJLAD claim, the Court necessarily agrees with UPS that Plaintiff did not present evidence that would permit a reasonable jury to conclude that UPS engaged in the sort of "egregious" or "outrageous" conduct involving "actual malice" or "wanton and willful disregard" necessary for the imposition of punitive damages.  *See, e.g.*, N.J. Stat. Ann. § 2A:15-5.12; *Rendine v. Pantzer*, 141 N.J. at 292.